UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ANDREA M. LEE,<br><br>               Plaintiff,<br><br>v.<br><br>BLAIR OLSEN, JEFFERSON COUNTY SHERIFF'S DEPARTMENT, JEFFERSON COUNTY,<br><br>               Defendants. | Case No.  4:14-cv-00160-REB<br><br>**MEMORANDUM DECISION AND ORDER** |

Pending before the Court in the above-entitled matter is Defendants' Motion for Summary Judgment (Dkt. 31).  Having heard oral argument and being otherwise advised, the Court enters the following memorandum decision and order.

## FACTUAL BACKGROUND

Plaintiff Andrea Lee ("Lee") was hired by the Jefferson County Sheriff's Department in 1993 as a driver's license clerk.  (Declaration of Andrea Lee ("Lee Decl."), Dkt. 33-7, ¶ 3.)   In the late 1990's, Lee was promoted to Driver's License Supervisor.  (*Id*. at ¶ 4.)  In 2005, Lee was given the additional responsibility of being the bookkeeper of the Department.  (*Id*. at ¶ 5.)  Defendant Blair Olsen ("Olsen") was the Sheriff of Jefferson County at all times during Lee's employment and was her supervisor.  (*Id*. at ¶ 6.)

**MEMORANDUM DECISION AND ORDER - 1**

On August 23, 2007, a dress code standard was implemented in the driver's

license/civil department of the Sheriff's Department that required female employees to

wear a skirt or dress to work, one day a week.  It also required that a uniform was to be

worn two days a week and on Fridays, denim pants or skirt could be worn.  (Affidavit of

Blake Hall ("Hall Aff."), Ex. B, Deposition of Blair Olsen ("Olsen Dep."), Dkt. 31-10,

Ex. 4 (dress code policy)).  There was not any male employees in the driver's license

division from 2007 to 2012, nor was their a dress code for male employees, if there were

any.  (Lee Decl. ¶ 9; Olsen Dep., 62:19-23.)   On the days when Lee wore a dress or skirt

to work, she attests that she was subjected to ogling and inappropriate comments by

Olsen and other male employees.  (Lee Decl., ¶ 11.)  This included that Olsen would

"smile and watch" her and Olsen would tell Lee, "you look nice today" on days she wore

a dress or skirt, but not when she wore pants.  (Hall Aff., Ex. A, Deposition of Andrea

Lee ("Lee Dep."), Dkt. 31-9, 122:15-19, 125:7-9.)   Lee never made a complaint about

the dress code between the time the dress code was adopted in 2007 and September

2012.[1]  (*Id*. at 116:7-18.)  In her deposition she stated that she was "not comfortable with

the policy" and that she expressed to her "employees" that she felt the policy "was

harassment."  (*Id*. at 113:24-116:3.)

---

[1] In her deposition, Lee suggests that she reported that she felt the dress code policy was harassment in "September of 2012" when her attorney wrote a letter to the County Commissioners.  As discussed later, there is no mention of the dress code or any gender or sex discrimination/harassment in that letter.  *See* Lee Dep., 116:4-9; Lee Decl., Ex. A (Dkt. 33-8).

**MEMORANDUM DECISION AND ORDER - 2**

On July 1, 2010, the Jefferson County Commissioners issued a "Discriminatory Workplace Harassment Policy and Complaint Procedure" ("the Discrimination Policy.") (Olsen Dep., Ex. 3.)  The purpose of the Discrimination Policy was "to clearly establish Jefferson County's commitment to work to provide a work environment free from unlawful harassment, to define discriminatory harassment, and to set forth procedures for investigating and resolving internal complaints of harassment."  (*Id*.)  The Discrimination Policy expressly provided for investigation and disciplinary action, including termination, for those who were found to be in violation of the policy.  (*Id*.)  For an employee who felt harassed or discriminated against, the Discrimination Policy contains a "Complaint Procedure."  (*Id*.)  The Complaint Procedure specifically provides numerous options for reporting the employee's complaint to: "their supervisor, Department Head, Risk Manager (County Clerk), Payroll Deputy Clerk, or County Prosecutor, legal counsel for the County."  (*Id*.)

In November or December of 2011, Lee began to discover Olsen was misuing public funds, specifically that he had issued a cell phone to his wife in Lee's name.  (Lee Dep., ¶ 87:24-88:1.)  Lee was never issued a cell phone by the Sheriff's Department or Jefferson County.  (Lee Decl., ¶ 12.)   A local newspaper, the Jefferson Star, investigated the issue and spoke with Lee who informed the newspaper she had never been issued a cell phone by the county.  (*Id*. at ¶ 15.)  Lee reported Olsen's misuse of funds in April 2012 to Marla Hurst in the clerk's office. (Lee Dep., 159:9-160:12.)

**MEMORANDUM DECISION AND ORDER - 3**

In the spring and fall of 2012, Sheriff Olsen was in a reelection campaign. (Affidavit of Blair Olsen ("Olsen Aff."), Dkt. 31-3, ¶ 11.)  Lee openly supported both of Olsen's opponents.  (*Id*.)

On or about July 30, 2012, Jefferson County Sheriff's Office enacted an amended media policy that all employees had to sign. (Counsel Declaration ("Dinius Decl."), Ex. A, Olsen Dep., Ex. 6, Dkt. 33-2.)  The media policy was prepared by Lexipol, a national organization that prepares standards for sheriff's offices around the United States and it was initially adopted by the Jefferson County Sheriff's Office in 1995.  (Olsen Aff., ¶ 12.) Initially, Lee refused to sign the policy, but eventually she did sign it. (Lee Decl., ¶¶ 16-17.)   Lee became aware that Olsen used a public gasoline credit card for personal use, would use a Sheriff's Department vehicle to travel and then submit requests for mileage reimbursement as if he had used his own vehicle, and also improperly used or approved of his deputies' use of public funds to purchase meals.  (Lee Decl., ¶¶ 18-20.)   Olsen also used public funds to purchase a personal, lifetime membership to the National Rifle Association.  (*Id*. at ¶ 21.)

During 2012, Olsen began to "systemically strip" Lee of her duties and responsibilities as Driver's License Supervisor and bookkeeper by prohibiting Lee's assistance with preparing the budget to the County Commissioners and assigning secretarial work that had been performed by Lee for years to other employees.  (Lee Decl., ¶¶ 27-29.)  Olsen also began directly addressing employees under Lee's supervision, thereby circumventing her authority and also embarrassed Lee in front of

**MEMORANDUM DECISION AND ORDER - 4**

other employees by shunning her and creating an atmosphere of stress and hostility.  (*Id.* at 30-31.)  Lee testified that the "shunning" she experienced included Olsen excluding her from conversations and she was left out of things "the office experienced as a whole."  Olsen was not as friendly and welcoming as he had been previously with her.  (Lee Dep. at 80:17-82:18.)

Lee attempted to communicate with Olsen regarding her bookkeeping duties, but Olsen refused to communicate with her.  (Lee Decl., ¶¶  33.)  Olsen told Lee that he was going to install a video camera in her office in the Driver's License Department.   (*Id.* at ¶ 34.)

On August 31, 2012, Lee notified the Jefferson County Commissioners through her attorney, in writing, that she was being retaliated against by Sheriff Olsen because she raised concerns regarding his misuse of funds.  (Lee Decl., Ex. A. (Dkt. 33-8.))  This letter asked that Lee have a new supervisor assigned to her.  (*Id.*)  She did not receive a response.  (Lee Decl., ¶ 38.)  There was no mention of the dress code policy, or any gender discrimination or harassment in the letter.  (Lee Decl., Ex. A.)

On September 14, 2012, Lee requested leave so she could have a surgery performed.  (Olsen Aff., ¶ 13.)  Plaintiff eventually requested to be out of the office from November 1, 2012,[2] to November 19, 2012.  (*Id.*)  Lee did not return to work on

---

[2]  Lee indicated she would work a half day on November 1, 2012, but ultimately did not show up for work at all that day.  She was not reprimanded or disciplined for this.  (Olsen Aff., ¶ 13.)

**MEMORANDUM DECISION AND ORDER - 5**

November 19, 2012.  On December 2, 2012, Lee informed Olsen that she had complications with her surgery and would be using her remaining leave and returning to work on December 29, 2012.  (*Id.*)  Olsen attempted to reach Lee by telephone prior to December 29, 2012, but Lee did not answer the phone or return any of Olsen's phone calls.  (*Id.*)

On December 31, 2012, Lee left a letter in Olsen's mailbox by which she resigned her position with the Jefferson County Sheriff's Office.   (Lee Dep., Ex. B (Dkt. 31-9)).  In the letter, Lee stated she was subjected to a hostile work environment created by Olsen and that she was resigning because of the disrespect she had for Olsen and his unethical ways.  (*Id.*)

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  One of the principal purposes of summary judgment "is to isolate and dispose of factually unsupported claims . . . ."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-34 (1986).  It is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources."  *Id.* at 327.  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477

**MEMORANDUM DECISION AND ORDER - 6**

U.S. 242, 247-48 (1986). There must be a genuine dispute as to any *material* fact – a fact

"that may affect the outcome of the case." *Id*. at 248.

The evidence must be viewed in the light most favorable to the non-moving party,

and the Court must not make credibility findings. *Id*. at 255. Direct testimony of the non-

movant must be believed, however implausible. *Leslie v. Grupo ICA*, 198 F.3d 1152,

1159 (9th Cir. 1999). On the other hand, the Court is not required to adopt unreasonable

inferences from circumstantial evidence. *See McLaughlin v. Liu*, 849 F.2d 1205, 1208

(9th Cir. 1988).

The moving party bears the initial burden of demonstrating the absence of a

genuine dispute as to a material fact. *See Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th

Cir. 2001) (en banc). To carry this burden, the moving party need not introduce any

affirmative evidence (such as affidavits or deposition excerpts) but may simply point out

the absence of evidence to support the nonmoving party's case. *See Fairbank v.

Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir. 2000).

This shifts the burden to the non-moving party to produce evidence sufficient to

support a jury verdict in his favor. *See Devereaux*, 263 F.3d at 1076. The non-moving

party must go beyond the pleadings and show "by her [ ] affidavits, or by the depositions,

answers to interrogatories, or admissions on file" that a genuine dispute of material fact

exists. *Celotex*, 477 U.S. at 324.

///

///

**MEMORANDUM DECISION AND ORDER - 7**

## DISCUSSION

**A.      Count I - Wrongful Discharge**

**1.      Constructive Discharge**

In Count I, Lee alleges that she was constructively discharged in violation of Title VII and the Idaho Human Rights Act.  (Comp. ¶¶ 50-54.)

Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin."  42 U.S.C. § 2000e-2(a)(1).

Constructive discharge occurs if an employee can prove he or she was subjected to intolerable working conditions such that a "reasonable person in his/her position would have felt compelled to resign."  *Pennsylvania State Police v. Suders*, 542 U.S. 129, 141 (2004); *see also Huskey v. City of San Jose*, 204 F.3d 893, 900 (9th Cir. 2000). Generally, an isolated incident is insufficient.  A plaintiff must establish "such aggravating factors, such as a continuous pattern of discriminatory treatment," to support a constructive discharge finding.  *Schnidrig v. Columbia Mach., Inc.*, 80 F.3d 1406,1411-12 (9th Cir. 1996) (citation omitted).  This showing can be based on the "cumulative effect" of defendant's actions.  *Draper v. Coeur Rochester, Inc.*, 147 F.3d 1104, 1110 (9th Cir. 1998).  Constructive discharge involves "something more" than normal harassment, and it does not lie "[u]nless conditions are beyond 'ordinary' discrimination[.]" *Suders*, 542 U.S. at 142.  The working conditions must "deteriorate, as

**MEMORANDUM DECISION AND ORDER - 8**

a result of discrimination, to the point that they become sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood and to serve his or her employer." *Poland v. Chertoff*, 494 F.3d 1174, 1184 (9th Cir. 2007) (quoting *Brooks v. City of San Mateo*, 229 F.3d 917, 930 (9th Cir. 2000)).

The bar for a finding of constructive discharge is set high "because federal anti-discrimination policies are better served when the employee and employer attack discrimination within their existing employment relationship, rather than when the employee walks away and then later litigates whether his employment situation was intolerable." *Poland*, 494 F.3d at 1184. In determining whether conditions are "intolerable," the conditions are measured at the time of the employee's resignation. *Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1465 (9th Cir. 1994) (alleged harasser was fired two and a half months prior to employee's resignation and after employee's preferred shift at work was restored so there was no constructive discharge). Waiting until the harassment has ended to resign is not constructive discharge. *Montero v. AGCO Corp.*, 192 F.3d 856, 861 (9th Cir. 1999) (employee waiting three to four months after harassment ended to resign is not constructive discharge).

Taking Lee's allegations as true, she was subjected to the following while employed at Jefferson County Sheriff's Department: (1) following the implementation of a dress code in 2007 that required females to wear a dress or skirt one day a week, she was subject to "ogling and inappropriate comments by Defendant Olsen and other male

**MEMORANDUM DECISION AND ORDER - 9**

employees"; (2) after Lee spoke to a local newspaper in the spring of 2012, she was asked to sign a media policy, that all employees of the Sheriff's Office were asked to sign; (3) in July of 2012, Olsen "systemically stripped" Lee of her duties and responsibilities as Driver's License Supervisor and as bookkeeper, including prohibiting her assistance with preparing the budget and assigning secretarial work traditionally performed by Lee to other employees; (4) Olsen began to directly address employees under Lee's supervision, thereby circumventing her authority; (5) Olsen "intentionally embarrassed [Lee] in front of employees by shunning [her] and creating an atmosphere of stress and hostility"; (6) Olsen attempted to take away comp time earned by Lee and refused to communicate with Lee; and (7) Olsen threatened to install a video camera in Lee's office. (*See* Lee Decl., ¶¶ 9-34.)

Most of these allegations stem from 2012, with the exception of the first allegation, and are not related to Lee's gender or the dress code. In her deposition, Lee said that the basis of her claim of wrongful discharge on the basis of her gender was that "I was being harassed, being a female" and that it was associated with "the dress policy." (Lee Dep., 158:14-22.) At the time of her resignation on December 31, 2012, Plaintiff was on medical leave from work, which began on November 1, 2012. There are no allegations of any harassment or hostility stemming from the Sheriff's Department during those two months. Further, the only (and minimal) contact that Lee had with anyone from the Sheriff's Department during that period was in regard to the amount of her remaining leave time and her return to work date.

**MEMORANDUM DECISION AND ORDER - 10**

The facts in this record are similar to those in *Brooks v. City of San Mateo*, 229 F.3d 917 (9th Cir. 2000).  In *Brooks*, the plaintiff was sexually harassed by her coworker on a single, albeit egregious, occasion.  *Id*. at 921.  The harasser placed his hand on the plaintiff's stomach, commented on its sexiness, and then later the same day forced his hand under her sweater and bra to fondle her breast.  *Id*.  The plaintiff immediately reported the behavior and the harasser was placed on administrative leave.  *Id*. at 921-22.  The plaintiff took a leave of absence in order to see a psychologist and recover from the incident.  *Id*. at 922.  Plaintiff returned to work six months later and reported that the other male employees ostracized her, she had trouble getting her preferred shifts and vacation time, her sick leave benefits were delayed, and she received what she contended was an unwarranted negative performance evaluation.  *Id*.  It was during the appeal of that performance evaluation that plaintiff left work and never returned.  *Id*.

The court in *Brooks* found that the circumstances plaintiff complained of after her return to work were "[t]aken collectively, . . . not sufficiently extraordinary or egregious to amount to constructive discharge."  *Id*. at 930.  The court upheld trial court's decision that the plaintiff's claim failed as a matter of law, concluding "we cannot see how a reasonable trier of fact could find that [plaintiff] was driven from the workplace."  *Id*.

Lee contends this case is more like the facts of *Wallace v. City of San Diego*, 479 F.3d 616, (9th Cir. 2007).  In *Wallace*, the relevant discriminatory conduct consisted of: (1) failing to consider plaintiff for promotion; (2) imposing excessive and discriminatory disciplinary action in response to actual misconduct (*i.e.*, the punishment did not fit the

**MEMORANDUM DECISION AND ORDER - 11**

"crime"); (3) refusing to allow plaintiff to teach at the police academy; (4) initiating disciplinary proceedings for plaintiff's absence from work while on military duty; (5) refusing to approve military leave; (6) threatening plaintiff that further misconduct could result in termination; and (7) issuing an "unacceptable" rating and putting plaintiff on a 90-day performance review. *Id*. at 626. The court found that this evidence was "sufficient to find that . . . a reasonable person in [plaintiff's] position would have felt compelled to quit . . ." *Id*.

Lee was "uncomfortable" with the dress code policy and that she "felt it was harassment." Lee alleges she was "ogled" and "inappropriate comments" were made when she wore a skirt or dress. Lee testified that Olsen would tell her she looked nice on days she work a skirt or dress, but not when she wore pants. Other times, Olsen would "smile and watch and... it made it very uncomfortable." On one occasion, Olsen asked Lee for a hug when she was emotional and upset regarding an accusation from her soon to be ex-husband's family that she was having an affair with Olsen.

Lee's main allegations, however, pertain to a period of time after she reported Olsen's misuse of public funds. These include that Olsen reassigned some of her secretarial work, spoke to Lee's subordinates directly, and prohibited her from assisting in preparing the budget. Lee also alleges that Olsen "embarrassed" and "shunned" her, by withholding job duties from her and leaving her out of conversations. These acts are not related to Lee's gender and do not support her claim of gender discrimination. Further, the conduct Lee complains of is not particularly extraordinary or egregious. The dress

**MEMORANDUM DECISION AND ORDER - 12**

code was implemented in 2007 and in place at the time of Lee's resignation at the end of

2012.  Lee testified that she was "uncomfortable" with the dress code policy and felt it

was "harassment."  Olsen would tell her she looked nice and smile at her.  She speaks of

being ogled, a fact that if true certainly justifies a feeling of being uncomfortable with the

boorish behavior that underlies such things.  She also says that she was complimented

upon her appearance when she work a skirt or dress, but not when she wore pants.  She

does not, however, suggest that the fact of such compliments was anything more than

compliments, or that such statements rose to the level of extraordinary or egregious

conduct.

Lee was on medical leave for two months prior to her resignation.  During her

medical leave, she contacted Olsen on one occasion to tell him that she was extending her

medical leave.  Lee was not reprimanded by Olsen for that action, nor did he express any

concern that she was extending her return to work date.   Then, at the end of that extended

leave period on December 31, 2012, Lee resigned.

Being "uncomfortable" and even "ostracized" does not create an intolerable work

situation.  In general, "adverse working conditions must be unusually 'aggravated' or

amount to a 'continuous pattern' before the situation will be deemed intolerable." *Tomco*

*v. Prada USA Corp.*, 484 F. App'x 99, 100 (9th Cir. 2012) (quoting *Turner v. Anheuser-*

*Busch, Inc.*, 876 P.2d 1022, 1027 (Cal. 1994)).  On this record, no reasonable juror could

find that Lee's working conditions in December 2012 were so intolerable that a

"reasonable person in his/her position would have felt compelled to resign."  *Suders*, 542

**MEMORANDUM DECISION AND ORDER - 13**

U.S. at 141.   To meet her burden, Lee must identify objectively intolerable working conditions.  The conduct alleged to have caused Lee to resign simply is not of the magnitude to establish a genuine issue of material fact as to whether Lee was constructively discharged.  Therefore, the Court grants Defendants' summary judgment on Lee's wrongful discharge claim under Title VII and the IHRA.[3]

### 2.    *Faragher/Ellerth* Defense

Defendants assert the *Ellerth/Faragher* affirmative defense to Lee's gender discrimination/wrongful discharge claim.  *See Faragher v. Boca Raton*, 524 U.S. 775, 776 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998).   The first prong of this defense is that the employer exercised reasonable care to prevent and correct any harassing behavior.  *Ellerth*, 524 U.S. at 765.  Whether the employer has a stated anti-harassment policy is relevant to the first element of the defense.[4]  *Id.*

No genuine issue of material fact would call into question whether  Jefferson County had a discrimination policy in place that encourages employees to report harassment or discrimination and indicates that such conduct is not acceptable behavior by an employee.  The Discrimination Policy provides a reporting mechanism for harassment or discrimination complaints.  The policy  (1) defined discriminatory

---

[3]  Violations of the IHRA for hostile work environment, sex discrimination, retaliation and constructive discharge rely on the same legal standards as for violations of Title VII. *See Bowles v. Keating*, 606 P.2d 458, 462 (Idaho 1979).

[4] Lee did not address this defense in her opposition to Defendants' motion for summary judgment.

**MEMORANDUM DECISION AND ORDER - 14**

harassment and retaliation; (2) set forth a complaint procedure; (3) identified disciplinary measures for policy violations; and (4) assured employees that retaliation for making a complaint was strictly prohibited.  *See Nichols v. Azteca Rest. Enterprises, Inc.*, 256 F.3d 864, 877 (9th Cir. 2001).   Whether an employer's policy ensures that a complaining employee can go around a supervisor alleged to be involved in such prohibited conduct, in making a complaint, also a key factor for this defense.  *Kohler v. Inter-Tel Technologies,* 244 F.3d 1167, 1180 (9th Cir. 2001).   Jefferson County's policy provides for this, and is sufficient to show reasonable care to prevent harassment and discrimination in the workplace.

The second prong of the defense is that the employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise.  *Ellerth*, 524 U.S. at 765.   An employee's failure to use a complaint procedure provided by the employer "will normally suffice to satisfy the employer's burden under the second element of the defense."  *Id.*

Lee was aware of the policy and signed an acknowledgment about reading the policy.  Lee testified that she did not recall ever reporting any acts of discrimination or harassment to any of the individuals identified in the discrimination policy.[5]  Lee said that she complained to the co-workers in her office that she did not like the dress code policy

---

[5]  Lee claims she did report it to the commissioners in "September of 2012" but there is no mention of discrimination, harassment, the dress code policy, or inappropriate comments in the 2012 letter to the county commissioners.  *See* Lee Decl., Ex. A.

**MEMORANDUM DECISION AND ORDER - 15**

and that she felt it was harassment.  Importantly, however, Lee never complained about

Olsen's comments regarding how she looked when she wore dresses or other

"inappropriate comments" to anyone in the policy identified to receive complaints.

Accordingly, the second prong is satisfied as a matter of law because Lee unreasonably

failed to take advantage of the preventative and corrective opportunities provided by

Jefferson County, although she knew of their existence.  *See Montero v. AGCO Corp.*,

192 F.3d 856, 863 (9th Cir. 1999).  The Court grants Defendants judgment in their favor

on the *Faragher/Ellerth* defense, to the extent it is applicable.

## B.    Counts 3 & 4 - Freedom of Speech

"Public employees do not surrender all their First Amendment rights by reason of

their employment." *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006.)  "Rather, the First

Amendment protects a public employee's right, in certain circumstances, to speak as a

citizen addressing matters of public concern."  *Id*.

The so-called *Pickering* test, is applied to evaluate First Amendment retaliation

claims such as alleged by Lee in this case.  *Eng v. Cooley*, 552 F.3d 1062 (9th Cir. 2009)

(discussing *Pickering v.  Bd. of Educ.*, 391 U.S. 563 (1968)).  There are five questions:

(1) whether the plaintiff spoke on a matter of public concern; (2) whether the plaintiff

spoke as a private citizen rather than a public employee; (3) whether the plaintiff's

protected speech was a substantial or motivating factor in the adverse employment action;

(4) whether the state had an adequate justification for treating the employee differently

**MEMORANDUM DECISION AND ORDER - 16**

from other members of the general public; and (5) whether the state would have taken the adverse employment action even absent the protected speech.  *Id*. at 1070.

Each of the factors must be considered and satisfied, as "failure to meet any one of them is fatal to the plaintiff's case." *Dahlia v. Rodriguez*, 735 F.3d 1060, 1067 n.4 (9th Cir. 2013) (en banc).  Because "all five factors are independently necessary," a reviewing court is free to address a potentially dispositive factor first rather than addressing each factor sequentially.  *Id*.

On this record, it is the third factor – whether Lee's speech was a substantial or motivating factor in an adverse employment action – that leaves no reason to go further. Lee alleges that after she made a complaint about Olsen's misuse of public funds in April of 2012, she suffered "an ongoing pattern of adverse action" that led to her constructive discharge.  (Compl., ¶¶ 66, 80.)  She alleges that her protected speech was a motivating factor in the adverse employment action she suffered.  (*Id*. at ¶ 68, 82.)

Lee alleges that after she spoke with a local newspaper and reported Olsen's misuse of public funds in the spring of 2012:  (1) Lee was asked to sign a media policy that all employees of the Sheriff's Office were asked to sign in July of 2012; (2) Olsen "systemically stripped" Lee of her duties and responsibilities as Driver's License Supervisor and as bookkeeper, including prohibiting her assistance with preparing the budget and assigning secretarial work traditionally performed by Lee to other employees; (3) Olsen began to directly address employees under Lee's supervision, thereby circumventing her authority; (4) Olsen "intentionally embarrassed [Lee] in front of

**MEMORANDUM DECISION AND ORDER - 17**

employees by shunning [her] and creating an atmosphere of stress and hostility," this included leaving Lee out of conversations; (5) Olsen attempted to take away comp time earned by Lee and refused to communicate with Lee; and (6) Olsen threatened to install a video camera in Lee's office.  (*See* Lee Decl., ¶¶ 9-34.)

To succeed on a First Amendment claim, a plaintiff must show that she suffered an adverse employment action.  *Nunez v. City of Los Angeles*, 147 F.3d 867 (9th Cir. 1998). Although "the type of sanction . . . 'need not be particularly great in order to find that rights have been violated,'" the plaintiff must nonetheless demonstrate the loss of "a valuable governmental benefit or privilege." *Hyland v. Wonder*, 972 F.2d 1129, 1134-36 (9th Cir. 1992) ((quoting *Elrod v. Burns*, 427 U.S. 347, 359 n. 13, (1976)); *see also Manhattan Beach Police Officers Ass'n v. City of Manhattan Beach*, 881 F.2d 816, 818–19 (9th Cir.1989) (denial of promotion); *Allen v. Scribner*, 812 F.2d 426, 434–35 (9th Cir.1987) (transfer to less desirable job assignment).  Mere threats and harsh words are insufficient.  *See Pierce v. Texas Dep't of Criminal Justice*, 37 F.3d 1146, 1150 (5th Cir. 1994); *cf. Gini v. Las Vegas Metropolitan Police Depart.*, 40 F.3d 1041, 1045 (9th Cir.1994) ("[D]amage to reputation is not actionable under § 1983 unless it is accompanied by 'some more tangible interests.' ") (quoting *Paul v. Davis*, 424 U.S. 693, 701 (1976)).

The appropriate inquiry is whether the action is "reasonably likely to deter employees from engaging in protected activity." *Coszalter v. City of Salem*, 320 F.3d at 975-976 (9th Cir. 2003) (internal quotation marks omitted); *see also Thomas v.*

**MEMORANDUM DECISION AND ORDER - 18**

*Carpenter*, 881 F.2d 828, 829 (9th Cir. 1989) (defining the relevant inquiry as whether

the state has taken action with the intention of retaliating against the exercise of

constitutionally protected rights). "Various kinds of employment actions may have an

impermissible chilling effect." *Coszalter*, 320 F.3d at 975.

"Minor indignit[ies] and de minimis deprivations of benefits and privileges on

account of one's speech do not give rise to a First Amendment claim." *Blair v. Bethel

School. Dist.*, 608 F.3d 540, 544 (9th Cir. 2010). "Rather, for adverse, retaliatory actions

to offend the First Amendment, they must be of a nature that would stifle someone from

speaking out. The most familiar actions are 'exercise[s] of government power' that are

'regulatory, proscriptive, or compulsory in nature' and have the effect of punishing

someone for his or her speech." *Id*. (quoting *Laird v. Tatum*, 408 U.S. 1, 11 (1972)).

In *Brooks v. City of San Mateo*, the court recognized that actions such as

"termination, dissemination of a negative employment reference, issuance of an

undeserved negative performance review and refusal to consider for promotion" would all

constitute adverse employment actions.  229 F.3d 917, 928 (9th Cir. 2000).   In *Brooks*,

the plaintiff complained of the following conduct after she returned to work following her

sexual assault claim: (1) she was "ostracized" by other coworkers; (2) she had to attend

workshops along with all other employees regarding the employer's sexual harassment

policy; (3) a friend of the harasser's was sometimes on the same floor as her at her office;

(4) her employer used all of the allotted 90 days to process her worker's compensation

claim; (5) her performance review was downgraded from "satisfactory" to "needs

**MEMORANDUM DECISION AND ORDER - 19**

improvement"; and (6) she was rescheduled to an unfavorable shift and denied vacation preference.  *Id*. at 929-930.  These last two were not "final" actions of the employer.  *Id*.  The plaintiff was in the process of appealing her evaluation when she decided to resign.  *Id*.  The court found that the plaintiff did not suffer any adverse employment actions and her retaliation claim was properly rejected.  *Id*.

Adverse employment actions must materially affects the compensation, terms, conditions, or privileges of employment.  *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008).  In *Strother v. Southern Cal. Permanente Med. Group*, the court found that exclusion from meetings, seminars and positions that would have made employee eligible for salary increases, denial of secretarial support, verbal and physical abuse, and more burdensome work schedule amounted to adverse employment actions.  79 F.3d 859, 869 (9th Cir. 1996).  In another case, where a supervisor refused to speak to the employee, the employee was transferred to new supervisor, was excluded from a meeting about her behavior, and her internet was disabled, the court found there was no adverse action.  *See Sutton v. Derosia*, No. 1:11-cv-01426-LJO, 2012 WL 4863788, *17 (E.D. Ca. Oct. 12, 2012).

Lee's allegations mainly focus on the "hostility" she experienced after she reported Olsen's misuse of funds in April of 2012.  This included that Olsen no longer addressed her or included her and she was left out of things "the office experienced as a whole."  Olsen was not as friendly and welcoming as he was before and he would not respond to her emails.  Lee also testified that as soon as she discovered the issue regarding the cell

**MEMORANDUM DECISION AND ORDER - 20**

phone in November of December of 2011, she "no longer trusted [Olsen]." Olsen was also "critical" when Lee turned in her time-off forms. Lee also states that "memos, general secretarial duties" were taken away from her. However, Lee had no reduction in compensation, number of hours worked, or job title. (*See* Lee Dep. at 79:1-82:10,83:24-84:3,87:15-23, 89:23-90:3, 110:20-111:4.) These allegations, including that she, along with all other employees, had to sign a media policy are akin to the allegations before the courts in *Brooks* and *Sutton*.

There is no genuine issue of material fact as to whether Lee suffered an adverse employment action. Lee's perceived hostility and the "shunning" or ostracism she experienced, do not amount to adverse actions. *See, e.g., Kortan v. California Youth Authority*, 217 F.3d 1104, 1113 (9th Cir. 2010) (allegations that supervisor was less civil, stared at her in hostile fashion, and became more critical did not rise to the level of adverse employment actions ). Additionally, Lee testified that she began to "distrust" Olsen several months prior, in November or December of 2011, and her interactions with him changed at that time. Lee alleges that Olsen was "critical" of her time-off sheets, but she does not allege that she was denied any time-off, or any other privileges or benefits of employment. Some of her duties were assigned to others, but this did not impact her pay or job title.

While Lee may have subjectively felt that Olsen's conduct created a retaliatory hostile work environment, the standard she must satisfy is whether the adverse actions were "reasonably likely to deter employees from engaging in protected activity." The

**MEMORANDUM DECISION AND ORDER - 21**

alleged adverse actions did not materially affect Lee's compensation, terms, conditions, or privileges of employment.  There is no record of any action or conduct taken by Olsen or Jefferson County that a reasonable juror could find constituted adverse employment actions.   Summary judgment will be granted in favor of Defendants on Lee's claims under the First Amendment and the Idaho Constitution Article I, Section 9.

## C.     Count 2 - Idaho Protection of Public Employees Act

In Count 2, Lee alleges that Defendants have violated the Idaho Protection of Public Employees Act, found at Idaho Code section 6-2104(1), *et seq*. (the "Whistleblower Act").  The Whistleblower Act prohibits an employer from taking adverse action against an employee because the "employee . . . .communicates in good faith the existence of any waste of public funds, property, or manpower, or a violation or suspected violation of law, rule or regulation adopted under the law of this state, a political subdivision of this state or the United States."

The Whistleblower Act requires a claim under the Act to be brought within 180 days "after the occurrence of the alleged violation."  Idaho Code §  6-2105.  Defendants argue that Lee's claim is barred for failure to meet that deadline.  Lee counters that Defendants are estopped from raising this defense because they follow state law which required that an employer "shall use appropriate means to notify its employees of their protection and obligation under this chapter."  Idaho Code §  6-2109.

Lee contends that a "defendant may be estopped to rely upon the statute of limitation if his statements or conduct caused the plaintiff to refrain from prosecuting an

**MEMORANDUM DECISION AND ORDER - 22**

action during the limitation period." *Mason v. Tucker and Associates*, 871 P.2d 846, 850 (Idaho Ct. App.1994).  In that case, the court held that a plaintiff could use equitable estoppel to preclude a statute of limitations defense, but "only for so long as plaintiff did not know and could not discover the truth . . ."

The statute of limitations in Idaho Code § 6-2105 could have been discovered by Lee at any point.  Lee was represented by counsel as early as August 31, 2012.  There was nothing preventing Lee, and importantly, not any acts of the Defendants preventing Lee, from "discovering" the fact of this statute and its limitation on when an action must be brought.  Additionally, there is nothing in the Act that places an affirmative duty upon an employer to tell an employee of the deadline for filing a lawsuit.  Defendants are not equitably estopped from asserting I.C. § 6-2105(2) as a defense to Lee's claim.

Lee resigned on December 31, 2012.  This is the last day an alleged violation of the Act could have occurred.  The deadline for filing her claim under the Whistleblower Act was June 29, 2013.  Lee filed her complaint on April 25, 2014.  Accordingly, the Court finds that Lee's whistleblower claim under I.C. § 6-2104 is barred and this claim is dismissed.

///

///

///

///

///

**MEMORANDUM DECISION AND ORDER - 23**

## ORDER

**IT IS THEREFORE ORDERED** that Defendants' Motion for Summary Judgment (Dkt. 31) is **GRANTED**.  Plaintiff's complaint is dismissed in its entirety.

Defendants shall submit a proposed judgment to the Court within 10 days of this Order.

DATED:  **September 29, 2016**

_____
Honorable Ronald E. Bush
Chief U. S. Magistrate Judge

**MEMORANDUM DECISION AND ORDER - 24**